KEVIN M. LALLY (SBN 226402)
**MCGUIREWOODS LLP**
klally@mcguirewoods.com
355 South Grand Ave., Suite 4200
Los Angeles, California 90071
Telephone: (213) 457-9862

LAWRENCE S. ROBBINS (Pro hac vice)
**FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP**
lrobbins@fklaw.com
7 Times Square
New York, NY 10036
Telephone: (212) 833-1118

ATTORNEYS FOR DEFENDANT JULIAN OMIDI

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>JULIAN OMIDI, *et al*,<br><br>  Defendants. | Case No. CR 17-00661(A)-DMG<br><br>**DEFENDANT JULIAN OMIDI'S MOTION FOR A SHORT STAY OF PROCEEDINGS PENDING IMMINENT SUPREME COURT RULING IN *CIMINELLI V. UNITED STATES*; [PROPOSED] ORDER**<br><br>DATE:   March 20, 2023<br>TIME:   2:30 PM<br>PLACE:  Courtroom 8C<br>        350 West 1st Street, 8th Fl.<br>        Los Angeles, CA 90012<br><br>Request for Oral Argument |

**TO THE CLERK OF THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on March 20, 2023 at 2:30 PM, or as otherwise directed by the Court, Defendant Julian Omidi hereby respectfully moves for a short stay

of sentencing pending the imminent decision of the United States Supreme Court's in *Ciminelli v. United States*, *cert. granted*, No. 22-1170 (S. Ct. June 30, 2022). Counsel met and conferred with the government. The government opposes the stay.

A memorandum in support is attached and incorporated herein setting forth the relevant facts and law in support.

Dated: February 27, 2023

Respectfully submitted,

**MCGUIREWOODS LLP**

By: */s/ Kevin M. Lally*
    KEVIN M. LALLY

**FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP**

By: */s/ Lawrence S. Robbins*
    LAWRENCE S. ROBBINS

ATTORNEYS FOR DEFENDANT
JULIAN OMIDI

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ............................................................................................... 1

A BRIEF STAY IS WARRANTED ................................................................... 1

CONCLUSION ................................................................................................. 10

# TABLE OF AUTHORITIES

**Cases**

*CMAX, Inc. v. Hall*,
    300 F. 3d 265 (9th Cir. 1962) ................................................................................ 2

*Cook v. Rent-A-Ctr., Inc.*,
    2017 WL 4270203 (E.D. Cal. Sept. 26, 2017) ..................................................... 10

*Garcia v. Shinn*,
    No. 22-99007, 2022 U.S. App. LEXIS 22948 (9th Cir. Aug. 17, 2022) .................. 2

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) .............................................................................................. 1

*Larson v. Trans Union, LLC*,
    2015 WL 3945052 (N.D. Cal. June 26, 2015) ....................................................... 9

*Leyva v. Certified Grocers of Cal. Ltd.*,
    593 F. 2d 857 (9th Cir. 1979) ................................................................................ 2

*Lockyer v. Mirant Corp.*,
    398 F. 3d 1098 (9th Cir. 2005) ........................................................................ 2, 10

*Mackall v. Healthsource Glob. Staffing, Inc.*,
    2017 WL 2665713 (N.D. Cal. Jan. 18, 2017) ...................................................... 10

*Nationwide Transport Finance v. Cass Information Systems, Inc.*,
    523 F.3d 1051 (9th Cir. 2008) ............................................................................... 9

*United States v. Begay*,
    No. 14-10080, 2019 U.S. App. LEXIS 36148 (9th Cir. Dec. 5, 2019) .................... 2

*United States v. DeSantis*,
    134 F.3d 760 (6th Cir. 1998) ................................................................................. 4

*United States v. Geozos*,
    870 F.3d 890 (9th Cir. 2017) ................................................................................. 9

*United States v. Howen*,
    2022 WL 1004832 (E.D. Cal. Apr. 4, 2022) .............................................. 2, 9, 10

*United States v. Kail*,
    No. 21-10376 (9th Cir. Oct. 17, 2022) .................................................................. 2

*United States v. Orona*,
    No. 17-17508, 2020 U.S. App. LEXIS 10413 (9th Cir. April 1, 2020) .................. 2

*United States v. Percoco*,
   13 F.4th 158 (2d Cir. 2021) ................................................................................................ 1

# INTRODUCTION

Defendant Julian Omidi moves to stay his sentencing pending the decision of the United States Supreme Court in *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021), *cert granted sub nom.*, *Ciminelli v. United States*, 142 S. Ct. 2901 (June 30, 2022). In *Percoco*, the Second Circuit "endorsed a 'right to control theory' of wire fraud that allows for conviction on a showing that the defendant, through the withholding or inaccurate reporting of information that could impact on economic decisions, deprived some person or entity of potentially valuable economic information." *Id*. at 170 (citations and internal quotation marks omitted). In *Ciminelli*, which was argued in November and will be decided before the end of the June, the Supreme Court is set to resolve the question presented of "[w]hether the Second Circuit's 'right to control' theory of fraud - which treats the deprivation of complete and accurate information bearing on a person's economic decision as a species of property fraud- states a valid basis for liability under the federal wire fraud statute, 18 U.S.C. § 1343." [1] Because the government aggressively advanced this "right to control" theory in this case, contending the insurance companies were deprived of their right to accurate information necessary to make economic decisions -- both on the merits and for sentencing purposes -- judicial efficiency and elemental fairness warrant a brief stay of the sentencing hearing, currently set for April 13, 2023, so that this Court and the parties have the benefit of the Supreme Court's decision before the case proceeds to final judgment.

# A BRIEF STAY IS WARRANTED

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which

---

[1] Found at https://www.supremecourt.gov/docket/docketfiles/html/qp/21-01170qp.pdf. Last visited 2/26/23.

bear upon the case." *Leyva v. Certified Grocers of Cal. Ltd.*, 593 F. 2d 857, 863-64 (9th Cir. 1979). Factors to consider in deciding whether to grant a stay in this circumstance include: "(1) the possible damage which may result from granting a stay, (2) the hardship or inequity which a party may suffer in being required to go forward, and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX, Inc. v. Hall*, 300 F. 3d 265, 268 (9th Cir. 1962); accord, *Lockyer v. Mirant Corp.*, 398 F. 3d 1098, 1110 (9th Cir. 2005).

Balancing these and similar factors, federal courts have recognized that, in criminal cases, good cause for a stay exists when the United States Supreme Court is deciding an issue in the case at bar. For example, in *United States v. Kail*, No. 21-10376 (9th Cir. Oct. 17, 2022), the Ninth Circuit recently stayed the proceedings pending the Supreme Court's decision in *Ciminelli*. *See, also*, *United States v. Orona*, No. 17-17508, 2020 U.S. App. LEXIS 10413, at *1 (9th Cir. April 1, 2020); *United States v. Begay*, No. 14-10080, 2019 U.S. App. LEXIS 36148, at *1 (9th Cir. Dec. 5, 2019); *Hechavarria v. Sessions*, 891 F. 3d 49 (2d Cir. 2018); *United States v. Howen*, 2022 WL 1004832, at *5 (E.D. Cal. Apr. 4, 2022); *Garcia v. Shinn*, No. 22-99007, 2022 U.S. App. LEXIS 22948, at *1 (9th Cir. Aug. 17, 2022).

All of the pertinent factors warrant a stay of Mr. Omidi's sentencing until the Supreme Court decides the *Ciminelli* case.

**1.** The government's central allegation in this case was that, at Mr. Omidi's direction, Klasky and others doctored the results of sleep studies so as to deceive insurers into providing coverage for Lap Band surgery.[2] But that theory ran headlong into a basic, and seemingly insurmountable problem: At least a significant number of the patients who were sleep tested qualified for Lap Band surgery *without regard to the results of the sleep*

---

[2] *See, e.g.*, Tr. 5187:9-11 (Klasky) ("The plan to falsify sleep study reports that were needed to be falsified in order to get the patient approved to have a lap band or -- or approved to have a lap band."); Klasky Plea Tr. 29:14-17 ("The reason why the sleep studies were being done was because it was a way to manufacture a co-morbidity for patients that otherwise would not have qualified under their insurance."); Klasky Sentencing Tr. 18:25 to 19:3 ("My role was to falsify sleep studies so that bariatric patients would have severe obstructive sleep apnea, and with this diagnosis, their insurance company would approve the bariatric surgery.").

*studies. See*, *e.g.*, Tr. 4765:19 to 4766:3 (Klasky) ("Well, in some cases, the patient was approved on other grounds than the sleep study. They had other comorbidities that qualified them for the lap band surgery"); Tr. 4072:4-15 (Hong) ("And so you see one of the things in this is that the BMI[3] is 41.11; right? A. Yes, sir. Q. And you understood where people had a BMI above 40, that typically meant this is a person that was the -- sort of automatic qualification point in terms of BMI for lap band surgery; correct? A. Yes, sir. Q. And so for a person looking at this, there would be no obvious indication that there would be even a reason for anyone to manipulate anything with regard to a sleep study; correct? A. Yes, sir); Tr. 4249:6-13 ("Q. Okay. And you see in this PSG, it indicates that her BMI was north of 40; correct? A. Yes, sir. Q. And I'm correct that, with a BMI north of 40, your understanding is you qualify for lap band, under the insurance rules, regardless of what your AHI is; correct? A. Yes, sir."). Indeed, the government itself conceded "that a BMI of over 40 constitutes a medical necessity." Tr. 921; *See, also,* Dkt. 1832, Michael Sedrak, M.D., Expert Decl. ¶ 10 ("[A] BMI of 40 or higher *alone* for virtually all insurance companies constitutes automatic qualification for Lap Band Surgery" and "alterations of the sleep studies in this morbidly obese population are frankly bizarre and lack to my knowledge a rational purpose").

In short, in a significant number of instances, the sleep study results did not affect the ultimate decision regarding medical qualification –the patient qualified for the surgery based solely on a BMI of 40 or higher, or because the BMI, coupled with some other co-morbidity, was sufficient to qualify the patient for the surgery. Accordingly, the government needed some other way to show that Mr. Omidi schemed to deprive the insurers of "money or property."

So the government invoked the "right to control" theory of fraud. According to this far-reaching theory, *any* inaccurate information in the submissions to the insurers qualified as a material falsehood causing loss because it denied the insurer's right to accurate and complete information*,* even if it would not affect the ultimate decision as to whether a

---

[3] "BMI" stands for "body mass index" -- a measure of a person's body fat.

patient qualified for Lap Band surgery.  By depriving the insurers of their "right" to accurate information, Mr. Omidi ostensibly "schemed to defraud" within the meaning of the mail and wire fraud statutes.

The First Superseding Indictment ("FSI") advanced the "right to control" theory right out of the gate:

● FSI ¶ 33 ("The information in the claim forms was **material** to payment, and TriCare and the *Insurance Companies would deny claims that contained **false, inaccurate, or misleading information*** about, for example, the service purportedly performed or its medical necessity,  the identity of the provider, or the place of service; *insurers were only obligated to pay "clean" claims, that is, claims that were accurate and complete*.") (emphasis added).

● FSI ¶¶ 34-36 (Insurance companies "***might** have denied* the claims or *subjected them to additional scrutiny*" if the insurance companies had known "the prescribing physician expected to be paid for writing the CPAP prescription" or authorization requests for the Lap Band procedure contained "false or fraudulent statements or documentation concerning an alleged co-morbidity.") (emphasis added).

**2.**     The defense sought at every turn to preclude the government from advancing this theory of fraud.  In a motion *in limine* (Dkt. 1188), the defense insisted that "fraud punishes representations that 'induced' a victim to "part with property or undertake some action that he would not otherwise do absent the misrepresentation." *Id*. at 4.[4]  As the defense explained, not every inaccurate statement constitutes fraud.  Rather, "the question at issue is whether the actual 'statements' that were contained in the claims paperwork were 'material' to the alleged victims' decision to approve the claim, *not* whether the alleged victims would have found information that the insurance claims paperwork was **inaccurate or incomplete to be material**." *Id*. at 5 (bold emphasis added).

The government unabashedly contended otherwise, asserting that *any* misrepresentation made to an insurer constituted a material falsehood because it interfered with the insurers' right to decision making based upon accurate information. Dkt. 1312 at 2 ("The *FSI also sets forth materiality allegations*, asserting that Tricare and the *insurance*

---

[4] Quoting *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998).

*companies would deny claims that contained false, inaccurate or misleading information and identifying specific types of information that were material to payment* (*e.g.*, false information in the sleep study *claim*, false information in the medical records, lack of medical necessity, etc.). (FSI ¶¶ 33-36.)") (emphasis added). In the government's view, any misrepresentation to an insurer constituted the deprivation of "property" insofar as "property" includes the right to act on an insurance claim free from any trace of falsity.

The Court largely adopted the government's position and denied Mr. Omidi's Motion *in Limine*. 9-16-21 Order, Dkt. 1370 at 3. The government thereafter capitalized on that ruling, packing its case-in-chief with testimony to support this theory of fraud. For example, the government elicited testimony from an insurance company witness that even if patients met medical necessity criteria for Lap Band surgery, any "false information" in a letter of medical necessity that did not affect medical necessity "would [] have been material to Anthem's decision to pay the claim." Tr. 992. The government went further by eliciting testimony that "no matter how small the misrepresentation," it was material "[b]ecause it would lay the foundation for other claims that come to us, and raise questions about what's happening in other places," and thereby affect the insurance company's decision "to approve a claim." Tr. 1840.

The government further advanced this theory of fraud when addressing materiality with every insurance company witness, including as follows:

> ●Tr. 1203-04 (Q. And Ms. Rojeski, did she have multiple comorbidities, claimed comorbidities? A. Yes. Q. And I believe, yesterday, you testified that, if Anthem had known that the sleep apnea diagnosis was false, that that would have been material to Anthem's decision to approve or to pay this claim. A. It would have been material, yes. Q. Why would that have been material if Ms. Rojeski was otherwise qualified for the lap band? A. If -- MS. WANG: Objection. Asked and answered. THE COURT: Overruled. THE WITNESS: *If I put inaccurate information here, that calls into question the accurate information on the other parts of the document she was providing to me, and it would elicit a more thorough review of what's going on so we can ascertain the veracity of it*. BY MR. MOGHADDAS: *Q. So if a patient had five other comorbidities but one of the submitted comorbidities was false, would that have been material to Anthem? A. Yes, that part would be material.*") (emphasis added);

- Tr. 1760 ("So you testified that for a request for authorization for a lap band, for example, a provider may include nutritional consultation, psych consultation. *Does Aetna expect that those documents are true and accurate?* A. Yes. Q. And why is that? A. Because you want an accurate representation of the clinical picture for the member, so that we can make the best decision for the coverage for that member. And *if we're not given true, accurate information, we may make the wrong decision*. Q. And if GET-THIN submitted false information in connection with those claims, would that have affected Aetna's decision to approve those claims? A. Yes.") (emphasis added);

- Tr. 7131("Q. Now, Ms. LeGare, if false and fraudulent information was sent in support of an authorization request for bariatric surgery, regarding one of these criteria that we're looking at here, whether it would be the BMI or the co-morbidity, would that have mattered to Health Net? A. Yes. Q. And why would that have mattered? A. Health Net's position is is that *we need to be making prior-authorization decisions, claim decisions, payment decisions based on true, accurate, and complete information*. If we're given false information, that that not only violates the contract but it's against the law. So *we need true, accurate, and complete information*, in order to make proper decisions under the policy. Q. And, Ms. LeGare, does that -- does that -- does your answer there also apply when a pre-authorization request is sent in where some information is true and some information is false and fraudulent? A. Yes. Q. And why would that be the case? A. Because again, the expectation is that the complete information is true, accurate, and complete. That some of it is true and some of it is false continues to impact your decision making, whether that is through a prior authorization or through a claim or through some other decision making. So true, accurate, and complete. Not partially true, partially false. That doesn't work") (emphasis added);

- Tr. 7134 ("Q. Now, you said that they didn't have a contractual relationship with Health Net. If an out-of-network provider submits a claim to Health Net, does it still have to be what you testified earlier, truthful, accurate, and complete? A. Yes.");

- Tr. 7213 ("Q. If an authorization request was submitted with some comorbidities that she had and some comorbidities that were false, is that something that would have mattered to Health Net? A. Yes.").

**3.** But it gets worse. The government then directed its expert witness, Michael Petron, to calculate "loss" across 8109 patients, which it offered as putative evidence of Mr. Omidi's "knowledge and intent". The claims selected as fraudulent included those where the patient qualified for the procedure based solely upon a BMI over 40 or with an elevated BMI and a qualifying pre-existing co-morbidity other than sleep apnea, but the claim included some other inaccurate information. For example, the government's loss calculation

included as loss claims all claims in which there was *any* change in the AHI score in the GT_MZ Michael Zarrabi version of the sleep study report -- regardless of whether the scores were altered by as little as 1 point, and regardless of whether the patient already would qualify for Lap Band surgery without the "altered" sleep study. Accordingly, as argued in Mr. Omidi's motion *in limine* to exclude Petron's testimony, the government's loss calculation is untethered to any *material* falsehood or traditional property "loss." Dkt. 1196 at 15.

**4.** To guard against the prospect that the jury would find intent to defraud based on simple inaccuracy, the defense asked the Court to instruct the jury that:

> "a representation, even though knowingly false, is not fraudulent unless it was made with the intent to be communicated to the persons who would act upon that representation to their detriment" (Dkt. 1365 at 45);

> "it is not enough [to establish materiality of the fraud] for the government to prove that those statements caused someone to enter into a transaction that he or she would otherwise have avoided. In order to prove that a scheme to defraud existed, the government must prove beyond a reasonable doubt that the materially false and fraudulent pretenses, representations, and promises misrepresented an essential element of the bargain (*id*.);

> "[t]o have the intent to deceive and cheat, the government must prove that the defendant acted with the intent not only to make false statements, but also to obtain from a victim money or property by means of those deceptions, that is, acted for the purpose of causing cognizable harm to the victim. If the Government proves only that the defendant schemed to deceive the victim, but not to deprive the victim of anything of value, you must find the defendant not guilty." *Id*. at 46.

The government objected, and the Court did not provide any of above requested instructions.

**5.** The government gilded the lily further in summation, emphasizing from the outset of its summation that all the jury needed to find was a deprivation of accurate information. *See* Tr. 8625 ("Now, at bottom, ladies and gentlemen, this is not a complicated scheme, just like *the rule that claims and documentation that is provided with them must be truthful, accurate, and complete is not a complicated rule*.") (emphasis added). So, too, for the element of materiality. According to the government:

> Another element of the wire and mail fraud that you must consider, ladies and gentlemen, deals with materiality. Now, the government has to prove that GET-THIN'S false claims were material, that they had a natural tendency to influence or were capable of influencing the insurance company's decisions to approve or pay these claims. *Now, you heard a lot about this from some live witnesses, and some by stipulation, that had those insurance companies known many of the things actually happening at GET-THIN, that would have been material. It would have affected their decisions to approve and pay the claims.* And none of this should have surprised you. *You heard that, if they knew the claim included false information, they would not have approved or paid the claim.* If they knew that a sleep study had not been ordered or interpreted by a licensed physician, they would not have approved the claim. If they knew that a sleep study had resulted in normal findings or it had shown that a patient did not have sleep apnea, they would not have approved or paid a claim for a CPAP device or CPAP accessories. *If they knew the letter of medical necessity submitted for authorization contained false information, including false diagnoses, false information about comorbidities, such as a Moderate or Severe obstructive sleep apnea diagnoses, they wouldn't have -- either wouldn't have authorized the lap band or, at a minimum, it would have caused them to conduct further scrutiny*. Because as you heard, if someone is trying to submit partially true, partially false, the false starts to lend -- or challenge the credibility of the remainder, the insurance company would, at least, look at it further at that point. And unsurprisingly, *if those insurance companies had known that a patient's sleep study contained false information*, included false information about the test results, the diagnosis, who interpreted the study, *they would have denied the claim*.

Tr. 8672-73 (emphasis added).

6.  Now, in its sentencing memorandum, the government relies again on Petron's loss calculations. Once again, the gravamen of the alleged loss is any misrepresentation, regardless of whether the falsity had any effect on the insurer's obligation to provide medically necessary reimbursement. *See*, Dkt. 1817 at 7-9.

7.  The Supreme Court granted certiorari in *Ciminelli* specifically to address the question whether "the deprivation of complete and accurate information bearing on a person's economic decision as a species of property fraud states a valid basis for liability under the federal wire fraud statute," s*ee*, Fn. 1, *supra*, and is now poised to relegate this "right to control" theory to the dustbin of history. Indeed, the Solicitor General expressly

disavowed the "right to control" theory based upon accurate information as both "incorrect"[5] and "overbroad",[6] conceding that the theory "conflates the materiality element and the property element",[7] and, in a rear-guard action, sought to defend the judgment in *Ciminelli* on alternative grounds. This theory that the Solicitor General recently renounced corresponds to the pervasive argument and testimony in this case that there is fraud liability because the insurance companies were deprived of "complete and accurate information" bearing on their claims decisions. *See*, ¶¶ 1-6, *supra*.

Mr. Omidi's sentencing hearing presently is set for April 13, 2023. A brief stay – almost certainly no longer than a few weeks as the Supreme Court's term ends in June – will enable both this Court and the parties to take account of the ruling before sentencing is imposed (and a possible misapplication of law occurs). Neither the government nor any other party would be prejudiced by such a brief stay. *See*, *Howen*, 2022 WL 1004832, at *5 (finding stay of approximately three months for Supreme Court to issue decision reasonable and citing resource for expected time frame of decision); *Larson v. Trans Union, LLC*, 2015 WL 3945052, at *8 (N.D. Cal. June 26, 2015) (finding a stay warranted where "[t]he Supreme Court [was] likely to issue a decision in the [relevant] case within one year"). Conversely, Mr. Omidi would be severely prejudiced were he to face a sentencing in which Petron's "loss" testimony – which may well be repudiated in the Supreme Court's forthcoming decision – figures so prominently. *United States v. Geozos*, 870 F.3d 890, 895–96 (9th Cir. 2017) (impermissible to sentence a defendant if the sentence "*may have*" rested on an invalid legal theory).[8] Finally, a brief postponement of the sentencing serves "the

---

[5] Gov't Br. at 24, *Ciminelli*, 2022 WL 10224977 (Oct. 12, 2022)

[6] *Id*. at 12.

[7] Dkt. 1813 at 294.

[8] *See, also, United States v. Yates*, 16 F. 4th 256, 265 (9th Cir. 2021) (holding that "the accurate-information theory is legally insufficient" basis for a fraud conviction"). Plainly enough, an expert may not offer "erroneous or inapplicable legal theories." *Nationwide Transport Finance v. Cass Information Systems, Inc.,* 523 F.3d 1051, 1060 (9th Cir. 2008). "As we have previously noted, a party is not entitled to present evidence on an erroneous or inapplicable legal theory to the jury, even if the evidence might have been relevant in some conceivable manner." *Id.* at 1063.

orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay," *Lockyer*, 398 F. 3d at 1110.  See e.g., *Howen*, 2022 WL 1004832, at *5 ("[T]he short wait to gain the benefit of the Supreme Court's guidance on the government's first two counts would promote 'the orderly course of justice.'"); *Cook v. Rent-A-Ctr., Inc.*, 2017 WL 4270203, at *4 (E.D. Cal. Sept. 26, 2017) ("Requiring the parties to go forward with litigation given the uncertainty [of how the Supreme Court will rule] would waste the time and resources of both the parties and the Court."); *Mackall v. Healthsource Glob. Staffing, Inc.*, 2017 WL 2665713, at *1 (N.D. Cal. Jan. 18, 2017) ("[A] stay is appropriate given that the Supreme Court has granted cert. on the central issue in this case.").

## CONCLUSION

WHEREFORE, for the foregoing reasons, this Court should issue a limited stay of the sentencing in this case so that this Court and the parties may have the benefit of the Supreme Court's guidance on a pivotal issue in this case.

Dated:  February 27, 2023            Respectfully submitted,

**MCGUIREWOODS LLP**

By: /s/ Kevin M. Lally
    KEVIN M. LALLY

**FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP**

By: /s/ Lawrence S. Robbins
    LAWRENCE S. ROBBINS

ATTORNEYS FOR DEFENDANT JULIAN OMIDI

**CERTIFICATE OF SERVICE**

I certify that, on February 27, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

*/s/ Kevin M. Lally*
Kevin M. Lally