E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
KRISTEN A. WILLIAMS (Cal. Bar No. 263594)
Deputy Chief, Major Frauds Section
ALI MOGHADDAS (Cal. Bar No. 305654)
DAVID H. CHAO (Cal. Bar No. 273953)
DAVID C. LACHMAN (Cal. Bar No. 261711)
Assistant United States Attorneys
Major Frauds/General Crimes Sections
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0526
     Facsimile: (213) 894-6269
     E-mail:    Kristen.Williams@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 17-661(A)-DMG |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT JULIAN OMIDI'S MOTION FOR STAY |
| v. | |
| JULIAN OMIDI, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kristen A. Williams, Ali Moghaddas, David H. Chao, and David C. Lachman, hereby files its opposition to defendant JULIAN OMIDI's motion for stay (CR 1837).

//

//

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 7, 2023         Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


          /s/
KRISTEN A. WILLIAMS
ALI MOGHADDAS
DAVID H. CHAO
DAVID C. LACHMAN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

ii

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant JULIAN OMIDI's ("defendant" or "OMIDI") motion for stay, based on an unrelated case currently pending before the Supreme Court, Ciminelli v. United States, 142 S. Ct. 2901 (June 30, 2022), should be denied because the motion is meritless. Ciminelli concerns whether an intangible interest, the "right to control" assets, constitutes "property" within the meaning of the federal wire fraud statute. Here, by contrast, defendant engaged in a common mail and wire fraud scheme seeking to deprive insurers of money, a traditional property right. As alleged in the First Superseding Indictment and proven at trial, defendant submitted false and fraudulent claims to insurance companies seeking payments for services, which payments the insurance companies would not have made had they known that the claims contained intentionally false information. Thus, in addition to being yet another delay tactic, the motion should be denied because Ciminelli has no bearing on this case. Defendant's claim that the government here relied on a different theory -- that the insurers were deprived of an intangible "right to control" their assets -- is based on a mischaracterization of the government's theory of the case and the evidence presented at trial. Because Ciminelli has nothing to do with this case, the motion for stay should be denied.

**II.   FACTUAL AND PROCEDURAL BACKGROUND**

The government's theory of the case, as alleged in the First Superseding Indictment (Dkt. 12 ("FSI")) and proven at trial, was simple and hardly novel: defendant OMIDI, SURGERY CENTER MANAGEMENT,

1

LLC, and others in the GET THIN network, operated a billing mill that defrauded Tricare and private insurers out of millions of dollars through the submission of fraudulent claims. (FSI ¶¶ 37-42.) As the Court knows from trial, these claims were falsified in numerous ways, including, <u>inter alia</u>, by falsifying the results of sleep studies (<u>see, e.g.</u>, testimony of Charles Klasky and Sherwin Hong); falsifying Epworth Sleepiness Scale scores (<u>see, e.g.</u>, testimony of Charles Klasky and Daniel Carriedo); and falsifying other information that was included in letters of medical necessity ("LOMNs"), such as the patients' weight, height, and BMI, or materials that were attached to LOMNs, including nutrition summary letters (<u>see, e.g.</u>, testimony of Charles Klasky, Sherwin Hong, Jessica Meyle, Jaffy Palacios, various patients).

In order to prove the charged mail and wire fraud schemes, the government was required to show, among other things, that the defendant knowingly participated in or devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises and that the statements made as a part of the scheme were material. <u>See</u> Ninth Cir. Model Crim. Jury Instr. No. 8.121. The government alleged that defendants sought to obtain money from Tricare and private insurers through certain false and fraudulent representations, which were material because Tricare and the private insurers would deny claims that contained false, inaccurate, or misleading information, and/or subject them to additional scrutiny. (FSI ¶¶ 34-36.) During pretrial briefing, defendant sought to preclude the government from asking certain questions regarding materiality. (Dkt. 1188.)

Specifically, defendant argued that the government should only be permitted to ask insurers whether affirmative statements in the claims were material, but not whether the insurers would have found undisclosed information that the claims paperwork were inaccurate or incomplete to be material. (Dkt. 1370 at 3.) The Court correctly rejected defendant's argument, concluding that the jury was entitled to evaluate the scheme to defraud based on not only words or statements alone, but also on the circumstances in which the words were used as a whole, including deceptive omissions. (Id. at 3-4.)

At trial, the insurers consistently testified that they would not have paid for a claim if they had known that the claim included certain intentionally false or misleading information. For example, according to the stipulated testimony of Tricare representative Jami Little, "If TRICARE had known that a claim included intentionally false information, TRICARE would not have paid the claim." (Tr. 7955:21-23.) Ms. Little's testimony detailed a series of specific scenarios in which TRICARE "would not have paid" claims if it had received claim submissions with certain false information.

Specifically, TRICARE would not have paid for sleep studies if it "had known" that a sleep study "had not been ordered by a licensed physician," that a sleep study "had not been interpreted by a licensed physician," or that "the sleep study submitted with a sleep study claim contained false information about the test results, diagnosis, and/or who interpreted the sleep study." (Tr. 7956:1-15.) Similarly, TRICARE "would not have paid" a claim for a CPAP titration sleep study if it "had known that an initial sleep study had not been

done, had resulted in normal findings, or had shown that the patient did not have sleep apnea." (Tr. 7956:16-19.)

Moreover, "[i]f TRICARE had known that a letter of medical necessity, submitted in order to obtain authorization for lap band surgery, contained false information, including false information regarding any one of the comorbidities listed such as that the patient had Moderate or Severe sleep apnea, TRICARE would not have authorized the lap band surgery. At a minimum, this would have prompted further scrutiny in TRICARE's review of the claim." (Tr. 7956:24-7957:6.) The testimony of other insurers Anthem, Aetna, and Health Net, similarly established that if they had known the claims included certain false information, they would not have paid the claim or at minimum would have examined the claims with greater scrutiny to determine whether to pay. (See Testimony of Anthem representative, Tr. at 966:1-3, 969:2-6, 986:6-8, 1007-1008; Testimony of Aetna representative, Tr. at 1761:6-9; Testimony of Health Net representative, Tr. at 7131-32.)

**III. ARGUMENT**

  **A. NO STAY IS WARRANTED BECAUSE <u>CIMINELLI</u> IS IRRELEVANT TO THIS CASE**

The Court should reject a stay because the Supreme Court's decision in Ciminelli has no bearing on this case. Ciminelli involved a bid-rigging scheme in which the defendant conspired with a state contract manager to manipulate a bidding process in favor of defendant's construction company. Gov't Brief, 2022 WL 10224977, at *4 (Oct. 12, 2022.) From start to finish, the government relied exclusively on a theory that defendant's scheme intended to deprive the victim of an intangible property right -- a "right to control"

4

1 one's assets.  For example, in the superseding indictment, the
2 government alleged that the defendants "devised a scheme to defraud
3 [the state contract manager] of its right to control its assets, and
4 thereby exposed [it] to risk of economic harm," through false
5 representations about the fairness and competitiveness of the bidding
6 process.  Pet'r Brief, 2022 WL 3999796, at *5 (Aug. 29, 2022).  The
7 government in Ciminelli did not allege that the defendant deprived
8 the victim of money or any other property right.  Nor did the
9 government offer any evidence at trial that the state was deprived of
10 a fair price, fair terms, or quality workmanship, or that it could
11 have obtained a better price from any other developer.  Id. at *5-6.
12 At the close of trial, the court instructed the jury that the
13 deprivation of "money or property" that the scheme must contemplate
14 "includes intangible interests such as the right to control the use
15 of one's assets" and that interest "is injured . . . when [the
16 victim] is deprived of potentially valuable economic information that
17 it would consider valuable in deciding how to use its assets."  Id.
18 at *6.  In essence, the prosecution rested on the theory that
19 defendant's scheme deprived the state contract manager of information
20 needed to make informed economic decisions concerning the bids, and
21 thereby violated the state's right to control its assets.  Id. at *7-
22 9.

23     Defendant Ciminelli was convicted on this "right-to-control"
24 theory of property, and the Second Circuit affirmed, rejecting the
25 defendant's argument that "the right to control one's own assets is
26 not 'property' within the meaning of the wire fraud statute." Id. at
27 *7.  Importantly, the Second Circuit acknowledged that "the
28

5

government offered little evidence that other companies would have successfully bid for the projects and then either charged less or produced a more valuable product absent the fraud." Id. at *8. However, the Second Circuit said that such evidence of pecuniary deprivation was not "a requisite for conviction," and that the "informational deprivation in the RFP process itself constituted all the harm to 'property' the government needed to show." Id. Thus, one of the central questions presented to the Supreme Court in Ciminelli is whether the Second Circuit's "right to control" theory – which treats the deprivation of complete and accurate information bearing upon a person's economic decision as a species of property fraud – standing alone states a valid basis for liability under the wire fraud statute. Id. at *i.

But whatever the result in Ciminelli may be, it will have no effect on the instant case. As established above, in Ciminelli the government's sole theory of property fraud was that the victim had been deprived of the intangible "right to control" their assets, not of any traditional property, such as money. Unlike in Ciminelli, the government's theory in this case has consistently been that defendants participated in a scheme to use false or fraudulent pretenses, representations, or promises in order to deprive Tricare and private insurers of "money," a traditional property right that is expressly used in the mail and wire fraud statutes. 18 U.S.C. §§ 1341, 1343; FSI ¶¶ 37, 39-40. Thus, whatever the Ciminelli Court decides to say about the intangible "right to control" one's assets, it will have no application to this case.

That fact also distinguishes this case from the examples defendant cites, in which courts have stayed criminal proceedings pending a controlling Supreme Court decision. For instance, this case is distinguishable from United States v. Kail, No. 21-10376 (9th Cir.), in which a stay was obtained pending Ciminelli because Kail also involved a bribery and bid-rigging scheme in which core questions on appeal concern whether the "harm" inflicted is cognizable as property fraud. See Kail, Mtn. for Stay, Dkt. 11 at 11-15 (9th Cir. Sept. 28, 2022.) Cf. United States v. Begay, 33 F.4th 1081, 1086 (9th Cir.) (held in abeyance pending Supreme Court decision on "closely related" issue relating to whether offense was "violent felony" under ACCA); United States v. Orona, 987 F.3d 892 (9th Cir. 2021) (same).

The remaining cases cited by defendant do not involve criminal proceedings, and in any event are distinguishable because the Supreme Court's decision had a direct impact in those cases. See Hechavarria v. Sessions, 891 F.3d 49 (2d Cir. 2018) (stay of removal in immigration proceedings); United States v. Howen, 2022 WL 1004832, at *5 (E.D. Cal. Apr. 4, 2022) (stay of civil enforcement action); Garcia v. Shinn, No. 22-99007 (9th Cir. Aug. 17, 2022) (stay of habeas proceeding); Larson v. Trans Union, LLC, 2015 WL 3945052, at *7 (N.D. Cal. June 26, 2015) (stay of class action lawsuit); Cook v. Rent-A-Ctr., Inc., 2017 WL 4270203, at *1 (E.D. Cal. Sept. 26, 2017) (same); Mackall v. Healthsource Glob. Staffing, Inc., 2016 WL 6462089, at *1 (N.D. Cal. Nov. 1, 2016) (same).

Defendant OMIDI attempts to conflate the issues of materiality and property deprivation by speculating – after the fact, and often

7

based on information undermined at trial – that the insurers would have been required to approve the lap band surgeries and pay the claims irrespective of the falsehoods contained in the claims, and therefore the insurers did not suffer any pecuniary loss. Accordingly, defendant argues, if the government's case is not premised on a pecuniary harm, it must be premised on the deprivation of the insurer's right to receive accurate information and thus their "right to control" their assets.  But this grossly mischaracterizes the government's theory of the case and the evidence at trial.  The government did not need to, and did not, rely on an intangible "right-to-control" theory of property fraud, because this case concerns the plain deprivation of the insurers' money.  Nor is it surprising that the government would ask witnesses to testify about whether false statements and misrepresentations used to obtain that money were material or argue from that testimony, since those issues went directly to elements it was required to prove.

   Moreover, as cited above, the insurers uniformly testified that the falsehoods and misrepresentations they received were material, such that if they had known the claims and LOMNs included false and fraudulent representations, they would not have paid the claims or issued the approval or would have investigated further before paying a dime.  Thus, defendant's naked assertion that the insurers were required to pay the claims in the face of false and fraudulent representations is not only after-the-fact speculation designed to absolve them of any responsibility for wanton and persistent lies, but also flies in the face of the trial testimony.  Accordingly,

8

defendant's attempt to bring this case within the ambit of <u>Ciminelli</u> is misguided.

Because <u>Ciminelli</u> is inapposite here, there is no justification for further delaying defendant's sentencing. The Federal Rules of Criminal Procedure require that courts "impose sentence without unnecessary delay." Fed. R. Crim. P. 32(b)(1). Victims of crimes are afforded the "right to proceedings free from unreasonable delay." 18 U.S.C. § 3771(a)(7). Because it is unnecessary to wait for <u>Ciminelli</u> to be adjudicated, the Court should reject defendant's motion for stay in order to satisfy justice and the victims in this case.

**B. DEFENDANT OMIDI ADMITS THAT <u>CIMINELLI</u> IS IRRELEVANT TO THIS CASE**

Defendant OMIDI concedes in his own sentencing memorandum that this Court does not need to wait for the decision in <u>Ciminelli</u>. In defendant's own words:

> Regardless of whether the *Ciminelli* Court totally invalidates or significantly limits the right to control theory, the record plainly establishes that the government pursued through the FSI, insurer trial testimony, and Mr. Petron's loss testimony a version of this theory that is impermissible under both *Yates* and the narrow limitation of the right to control theory proposed by the Solicitor General.

(Dkt. 1812 ("OMIDI Sent. Memo") at 44.) In other words, defendant takes the unequivocal position that Ninth Circuit precedent in <u>United States v. Yates</u>, 16 F.4th 256, 265 (9th Cir. 2021), already settles the state of the law for the Court to decide whether the government has relied upon an invalid theory of property fraud. While the government obviously disagrees with defendant's distortion of the

9

facts and its argument based on <u>Yates</u>, and will oppose those arguments in its response papers, defendant's admission quoted above underscores that even defendant does not believe the outcome in <u>Ciminelli</u> impacts his sentencing.

**IV. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny the motion to stay.

10